DENISE NAEGER,               )
                             )
          Plaintiff,         )
                             )
     v.                      )     Case No. 1:12CV13 FRB
                             )
CAROLYN W. COLVIN,[1] Commissioner )
of Social Security,          )
                             )
          Defendant.         )


## MEMORANDUM AND ORDER

     This matter is before the Court on plaintiff Denise
Naeger's appeal of an adverse decision of the Social Security
Administration.  All matters are pending before the undersigned
United States Magistrate Judge, with consent of the parties,
pursuant to 28 U.S.C. § 636(c).

### I.    Background and Procedural History

     Plaintiff Denise Naeger applied for Disability Insurance
Benefits ("DIB") pursuant to Title II, and Supplemental Security
Income pursuant to Title XVI, of the Social Security Act, 42 U.S.C.
§§ 401, et seq. (also "Act"), alleging that she became disabled on
January 6, 2009.  (Administrative Transcript ("Tr.") at 180-189).
Plaintiff's applications were denied, and she requested a hearing

_____

     [1]Carolyn W. Colvin became the Acting Commissioner of Social
Security on February 14, 2013.  Pursuant to Rule 25(d) of the
Federal Rules of Civil Procedure, Carolyn W. Colvin should
therefore be substituted for Michael J. Astrue as the defendant
in this case.  No further action needs to be taken to continue
this suit by reason of the last sentence of 42 U.S.C. § 405(g).

- 1 -

before an administrative law judge ("ALJ"), which was held on August 10, 2011. (Tr. 28-73).

On August 25, 2011, the ALJ issued an unfavorable decision. (Tr. 81-105). However, additional evidence was subsequently submitted. This additional evidence, which consists of an August 31, 2011 letter from Steven A. Harvey, M.D., appears in the administrative transcript at page 685. The ALJ re-opened plaintiff's case "in order to give that additional evidence careful consideration." (Tr. 11). After doing so, the ALJ issued a second unfavorable decision on November 7, 2011. (Tr. 8-27). On January 3, 2011, defendant agency's Appeals Council denied plaintiff's request for review, and the ALJ's decision thus stands as the Commissioner's final decision subject to review in this Court. 42 U.S.C. § 405(g).

The issues that plaintiff has submitted for judicial review in this case are that the ALJ erred in determining that pustular psoriasis was not a severe impairment, and that the ALJ erred in discounting opinion evidence from plaintiff's psychiatrist (Dr. Harvey) and therapist (Maureen Lenz), and from plaintiff's treatment provider Nurse Practitioner Mary Ann McCullough.

## II. Evidence Before The ALJ

### A. Plaintiff's Testimony

Plaintiff first responded to questions posed by the ALJ. Plaintiff testified that she is a high-school graduate, and had been married for 27 years. (Tr. 32). She lived with her husband and their two adult children, and had medical insurance through her

husband's employment.  (Tr. 33).

Her work history included work as an assembler of binders of vinyl siding samples, a job she quit because she "had a supervisor that constantly harassed me." (Tr. 34).  In addition, she worked for Silvanus Products for eight years, making binders and checkbook covers.  (Tr. 35).  She worked in the meat department of Rozier's Country Mart, where she wrapped meat, stocked shelves and waited on customers, and worked for Oberle Meats, performing essentially the same job.  (Tr. 35-36).  She also worked for National Vinyl Products (also "NVP") making binders with hot glue and white glue.  (Tr. 35-36).

She quit working for National Vinyl Products because she "was tired of making binders" and because a work friend "turned" on her and talked about her behind her back.  (Tr. 36-37).  She quit working for Rozier's Country Mart because her "husband wouldn't leave [her] alone about only working four days a week and only making $6.45, and [asked her] to find another job, which is when [she] went to NVP." (Tr. 37).  She quit her job at Oberle Meats because a coworker "read [her] the Riot Act" in front of someone. (Id.)

Plaintiff also worked for Silo Incorporated, a residential care facility, as a "level one med aid" handing out medications, cleaning, cooking, washing dishes, and dealing "with the outbursts that the residents had." (Id.)  She also worked for a health care company called Marian Cliff until she was fired for refusing to crush a patient's pills.  (Tr. 38).  Plaintiff

testified that this occurred on January 6, 2009, her alleged onset date. (Tr. 40). Plaintiff's most recent job was for a home health care company called Victor's Home Health. (Tr. 39). Plaintiff testified that she quit this job after noticing that her paycheck was eight hours short and arguing with her supervisor about it. (Tr. 39).

Plaintiff then responded to questions from her attorney. She testified that Dr. Harvey told her that she should not work anymore because she "was too stressed out" and "could not deal with other people" and that she did "not have a working ability at this time." (Tr. 41). Plaintiff testified that, when stressed, her leg shook, she twisted and pulled on her hair, paced, smoked cigarettes, and sometimes screamed at everyone. (Id.) Plaintiff testified that she was presently stressed because she was losing her home, and because of a girlfriend who irritated her. (Tr. 41-42). She stated that her leg sometimes shook for an hour or more. (Tr. 42).

Plaintiff testified that she was hospitalized due to stress after being fired. (Id.) She stated that she saw Dr. Harvey once every three or six weeks. (Tr.43). She stated that

she took Lamictal,[2] Lexapro,[3] and Abilify,[4] and that the drugs did not cause side effects and in fact she was "doing okay" on them. (Tr. 44). Plaintiff testified that she also saw a counselor every three to four weeks. (Id.)

Plaintiff testified that she did not sleep well and felt insecure when her husband was away because she had been molested as a child, and therefore disliked being alone. (Tr. 45). Plaintiff testified that she experienced crying spells once or twice per week, which she attributed to her thoughts of how her mother treated her and her brother. (Tr. 45-46).

Plaintiff testified that she did not go grocery shopping because she could not adhere to a list, and instead bought things she wanted that her husband did not want her to buy. (Tr. 46). She testified that her girlfriends told her that she jumped from subject to subject, and that her husband took care of household bills because she was bad at math. (Id.) She was able to keep track of doctor's appointments, but sometimes forgot to take medication. (Id.) She stated that she sometimes burned food

---

[2]Lamictal, or Lamotrigine, is an anticonvulsant that is used to decrease abnormal activity in the brain. It is prescribed for various conditions, including epilepsy and bipolar disorder. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695007.html

[3]Lexapro, or Escitalopram, is used to treat depression and generalized anxiety disorder. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603005.html

[4]Abilify, or Aripiprazole, is an atypical antipsychotic medication that changes the activity of certain natural substances in the brain. It is prescribed for various conditions, including schizophrenia and mood disorders. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603012.html

because she needed to walk away from the stove. (Tr. 48). Plaintiff testified that vacuuming pulled on her back and right hip, and that her son did the laundry. (Id.)

Plaintiff testified that she had symptoms in her lower back if she stood in the same place for five to ten minutes. (Tr. 48). She did not drive out of town, and stated that she did not have a driver's license until 2003, when she got over the fear of driving and her niece taught her to drive. (Tr. 49). Plaintiff stated that she showered a maximum of once per week, and stayed in her pajamas because they were more comfortable than clothes, and because she did not feel like going anywhere. (Id.)

When asked to describe a typical day, plaintiff testified that she rose at 5:00 and talked to her sister on the telephone. (Tr. 50). She then used the computer to play games "or whatever, you know, I'm doing that day." (Id.) She returned to bed at 6:30 or 7:00 and slept for another hour and one-half to two hours, and then watched television. (Id.) She took the dogs out if her husband was not there, and then watched television. (Tr. 50-51). She testified that she got along with her sister and a girlfriend, but did not like being around more than three people at once. (Tr. 51).

When asked to describe her past interactions with supervisors, plaintiff testified that, at Silvanus, the supervisors talked about her within earshot, which plaintiff found frustrating and irritating. (Tr. 52). She testified that one supervisor at Silvanus did not like her, and that plaintiff put up with her for

four years before quitting. (Id.) When asked to explain her earlier statement about a work friend turning on her, plaintiff explained that, while she was "punching" orders, the friend altered the mechanism so that the orders were punched incorrectly, and plaintiff was reprimanded. (Tr. 53).

Plaintiff testified that she could no longer work in home health care because of the behavior of the residents, and described an incident in which a resident trapped her in a room and threatened to hurt her. (Tr. 54-55). When asked why she could not perform a job where she did not have to be around a lot of people, plaintiff testified: "[b]ecause - - I don't know. I get - - I don't know. I don't know how to answer that." (Tr. 55). When asked whether she could do something else, some line of work that did not involve being around a lot of people, plaintiff testified: "I don't know if I could or not. I don't - - I mean, just dealing with anybody at this time, I can't do. I am really - - I am so disgusted with people. That's why I don't leave my house. I don't want to be around people most of the time. And I even trouble [sic] with my husband and my sons." (Id.)

Plaintiff testified that she used to smoke marijuana to deal "with everything" but had not smoked marijuana since May of 2011 (about three months before the administrative hearing). (Tr. 55-56). Plaintiff testified that Dr. Harvey had told her that smoking marijuana would impact the efficacy of her psychiatric medications, and plaintiff noticed a big difference when she stopped. (Tr. 56).

Plaintiff testified that she had a "bad [right] hip" due to a fall down stairs and that, sometimes when walking, she would feel pinching and pain down her leg and up through her spine. (Tr. 57, 58). She testified that she was able to walk down a hill near her home, but then needed to sit to allow her back to rest before resuming walking. (Tr. 57). She did not have trouble sitting if her feet were flat on the ground. (Id.) She could lift and carry 20 pounds, but doing so sometimes pulled on her right hip. (Tr. 57-58).

The ALJ asked plaintiff whether there was anything else he needed to know regarding disability, why plaintiff believed that she could not work, and plaintiff replied that her record spoke for itself, that she had been unable to hold a job for more than a few months, and that she had pushed herself to remain at Silvanus for as long as she did. (Tr. 58). Plaintiff also stated "I get bronchitis," and stated that she used an inhaler and asthma medicine. (Id.)

The ALJ then heard testimony from John Stephen Dolan, a vocational expert (also "VE"). Mr. Dolan classified plaintiff's past work and, after considering hypothetical questions posed by the ALJ, testified that the hypothetical individuals could perform plaintiff's past work as a bindery worker, as well as several other occupations, including dishwasher, housekeeper/cleaner, poultry eviscerator, and store laborer. (Tr. 59-66). Mr. Dolan also responded to questions from plaintiff's attorney. (Tr. 67-69).

Plaintiff then testified that, due to pustular psoriasis

on her hands, she could not expose her hands to chemicals or water, and could not wear latex gloves. (Tr. 69-70). Upon further questioning from the ALJ, Mr. Dolan testified that such a limitation would preclude an individual from performing work as a dishwasher, and would reduce by three-fourths the number of housekeeper/cleaner jobs that the individual could perform. (Tr. 70).

> B. <u>Medical Records</u>

From April of 2008 through July 2008, plaintiff was treated at River City Health Clinic, and was seen by Clinical Psychologist Debra Rau, Ph.D. (Tr. 376-85). Plaintiff was diagnosed with depression, and prescribed medications. (<u>Id.</u>) Records from Southeast Missouri Hospital indicate that plaintiff was hospitalized on June 30, 2008 after appearing for an outpatient appointment complaining of increasing depression, anxiety, and suicidal thinking after being dismissed from her job that day. (Tr. 338, 340). Plaintiff reported smoking three packs of cigarettes per day, and smoking marijuana. (Tr. 340). Her medical history was noted to include psoriasis, borderline diabetes mellitus, fatty liver, and chronic low back pain. (<u>Id.</u>) She reported poor sleep, stating that she woke up during the night and smoked and drank coffee, which the examiner noted was "antithetical to sleep." (<u>Id.</u>) Plaintiff reported being overwhelmed with stress due to long working hours and to the fact that her sons, ages 22 and 19, lived with her and argued and fought all of the time, and did not contribute to the household. (Tr. 342).

Laboratory evaluation revealed a normal profile, including liver function. (Tr. 338). Urine drug screen was positive for cannabis and pain medication. (Id.) Physical examination was negative, and mental status evaluation revealed a depressed mood and constricted affect, but was otherwise normal. (Tr. 343). She was discharged on July 2, 2008, at which time she was considered a low risk for suicide. (Tr. 338). Her medications were adjusted. (Tr. 343).

Records from Advanced Psychiatric Services indicate that plaintiff was seen on several occasions for counseling sessions from July 22, 2008 to January 22, 2009. (Tr. 412-32).

On March 23, 2009, Joan Singer, Ph.D., completed a Psychiatric Review Technique form. (Tr. 463-73). Dr. Singer noted that plaintiff did not report her activities of daily living and, when called, reported that she had returned to work. (Tr. 473). Dr. Singer concluded that plaintiff did "not wish to proceed" with her claim and wanted a "decision on info in file." (Id.) Dr. Singer determined that there was insufficient evidence, and denial was appropriate. (Id.)

Records from St. Louis Public Schools indicate that plaintiff did not receive special education services. (Tr. 475).

On September 2, 2009, plaintiff saw Nurse Practitioner Mary McCullough at the Ste. Genevieve County Memorial Hospital Physicians' Clinics with complaints of isolating herself, not wanting to be around her family or friends, fluctuating between crying and laughing, unstable mood, anxiety, irritability, anger,

sleep disturbance, sadness, decreased concentration, weight gain, appetite change, depression, suicidal thoughts, marijuana use, and compulsive behaviors. (Tr. 484, 486). Plaintiff recounted her 2008 hospitalization and subsequent therapy, and stated that she had been off of her psychiatric medication "for months." (Tr. 484). Upon examination, she was alert and oriented but anxious. (Tr. 487). Physical examination, including examination of plaintiff's skin, was normal. (Tr. 486-87). Plaintiff was referred for therapy, and given medication. (Tr. 488).

Plaintiff returned to Nurse McCullough on October 2, 2009 with complaints of a rash on her breast and trunk for the past two weeks. (Tr. 480). Nurse McCullough wrote "Cymbalta vs fleas." (Id.) Plaintiff reported that she was a smoker. (Id.) Upon examination, Nurse McCullough observed a large plaque lesion with scale on plaintiff's right chest, and scattered, fine-scaled lesions on plaintiff's trunk. (Tr. 482). Nurse McCullough diagnosed plaintiff with Pityriasis Rosea, which she told plaintiff was a self-limiting condition that should resolve on its own in six to 12 weeks with no treatment or medication. (Tr. 483).

On December 8, 2009, plaintiff saw psychiatrist Steven A. Harvey, M.D., of Allied Behavioral Consultants with mood, anxiety and cognitive complaints. (Tr. 535). Plaintiff could not articulate her complaint, but complained a lot about stressors in her life and complained that she could not process information and could not hold a job. (Id.) Dr. Harvey noted that plaintiff began smoking marijuana (for which Dr. Harvey used the abbreviation

- 11 -

"mj") as a teenager and currently smoked marijuana heavily, but did not feel she had a problem with it. (Id.) Plaintiff stated that her son thought she was a "pot head" but that she just had "a couple of hits this morning." (Id.) Plaintiff stated that she once stopped smoking marijuana for two to three weeks. (Tr. 535). Dr. Harvey wrote: "[l]ater she said that she quit for yrs, but she only claimed that - - as a change of story - - after I started bringing up mj as a cause of her mood problems." (Id.) Plaintiff reported that both of her children lived at home and that the older one was not working but she could not kick him out. (Tr. 536). Plaintiff reported that she was not working and "thinks she won't go back to work." (Id.)

Dr. Harvey noted that plaintiff was hard to talk to because she was scattered. (Id.) Dr. Harvey noted that plaintiff's hygiene and grooming were good. (Id.) Plaintiff was alert and fully oriented. (Tr. 536). Dr. Harvey diagnosed plaintiff with depression and cognitive problems not otherwise specified and, after both, questioned whether the conditions were substance-induced. (Id.) He also diagnosed plaintiff with marijuana dependence, and instructed plaintiff to abstain from marijuana. (Id.) He assessed plaintiff's global assessment of functioning ("GAF")[5] score as 50. (Id.)

_____

[5]The GAF score is the clinician's judgment of the individual's overall level of functioning. See Diagnostic and Statistical Manual of Mental Disorders, Text Revision 34 (4th ed. 2000). GAF scores of 41 to 50 represent serious symptoms or impairment in social, occupational or school functioning; scores of 51 to 60 represent moderate symptoms or difficulty in those

Dr. Harvey wrote: "[b]ottom line – likely large portion of her complaints are mj-induced" and that plaintiff's problems would not improve with medication if she continued to smoke marijuana. (Tr. 535).

Plaintiff returned to Dr. Harvey on February 18, 2010, and reported doing poorly and that "[p]eople piss me off . . .". (Tr. 533). Plaintiff was still using marijuana. (Id.) Dr. Harvey's examination and diagnoses were unchanged. (Id.) Dr. Harvey prescribed Lexapro. (Tr. 534). She returned on March 18, 2010 and reported that, after her father's recent death, she used a lot of marijuana but then stopped, and had been clean for 22 days. (Tr. 532). Dr. Harvey noted that plaintiff was better, and was able to carry on a conversation. (Id.) His diagnoses were unchanged, but he assessed plaintiff's GAF as 70. (Id.) She returned on June 10, 2010, and Dr. Harvey wrote: "[b]etter! Pt really better with Abilify. She is surprised. Feels a lot better." (Tr. 574). Dr. Harvey's diagnoses were the same, but he assessed plaintiff's GAF as 70. (Id.)

On May 5, 2010, plaintiff was seen by Maureen Lenz, MS, LCSW. (Tr. 627). Plaintiff's "Presenting Problem" was noted as: "[w]ant to get disability. I can't work. I hate people." (Id.) Plaintiff reported being angry and depressed all the time, complained of "back pain from arthritis," stated that she had carpal tunnel syndrome, claimed she could not sleep, and thought

---

areas; and scores of 61 to 70 represent mild symptoms with a reasonably good level of functioning. (Id.)

she was bipolar. (Id.) Plaintiff was angry with certain family members, including her mother and her older son. (Id.) She denied harming herself or others. (Tr. 628). Plaintiff reported financial, physical, interpersonal, and vocational stressors, reported that she had taken learning disabled classes, and reported that she was facing foreclosure and could not meet expenses. (Tr. 628-29, 631). She reported that she smoked marijuana whenever she could get it. (Tr. 630). Plaintiff reported that she did leather work and crochet, and spent time on the computer. (Tr. 632).

Upon examination, Ms. Lenz noted that plaintiff's appearance and speech were normal, that plaintiff was angry, bitter and resentful, denied suicidal intent, ate a high fat diet, and had poor insight. (Tr. 633). She diagnosed plaintiff with depressive disorder not otherwise specified and possible personality disorder, and assessed a GAF of 50. (Id.)

X-rays of the lumbar spine, performed on May 17, 2010, revealed mild L5-S1 facet arthritis and bilateral degenerative sacroiliitis. (Tr. 551). Cervical spine x-ray performed on May 26, 2010 was interpreted as normal. (Tr. 550). MRI of the thoracic spine performed on May 28, 2010 revealed suspected preexisting spondylosis related osteophytosis producing minimal cord impingement but no displacement. (Tr. 545). MRI of the lumbar spine performed on this date revealed no acute lumbosacral spine disease. (Tr. 546).

Plaintiff returned to Ms. Lenz on May 28, 2010. When asked why she could not work now, plaintiff replied "I hate people"

and then laughed "[t]o try to get rid of the anger." (Tr. 643).

Plaintiff was resentful and guilty, and stated that her family had

no money, which was her fault for not working and for spending

money irresponsibly, such as on marijuana. (Id.) Ms. Lenz noted

that plaintiff burped loudly and said shocking things. (Id.) On

June 10, 2010, Ms. Lenz noted that plaintiff's affect was angry,

and that plaintiff reported that all the wrong things had been done

to her. (Tr. 644). Stressors included finances, clutter, and the

fact that her older son did not do anything. (Id.) Plaintiff

reported that her husband would not let her drive or buy anything,

and plaintiff used marijuana and sleep as coping mechanisms. (Id.)

On June 17, 2010, plaintiff was irritable and angry, and Ms. Lenz

wrote that plaintiff's stressors were perhaps of her own making.

(Tr. 645).

On June 11, 2010, plaintiff saw Nurse McCullough and

reported that taking deep breaths caused squeezing in her chest and

upper abdomen. (Tr. 608). There is also the notation that

plaintiff had a new mental diagnosis of borderline personality

disorder, although the origin of this diagnosis is not mentioned.

(Id.) Upon examination, plaintiff appeared comfortable. (Tr.

610). Wheezing was noted, but the remainder of Nurse McCullough's

examination, including psychiatric examination, was normal. (Tr.

610-11). Nurse McCullough wrote that she "strongly advised"

plaintiff to stop smoking, but that plaintiff reported that she was

"not ready at this time." (Tr. 612). Plaintiff returned to Nurse

McCullough on June 22, 2010 and reported that she was currently

undergoing physical therapy for chronic back pain, and described an incident in which she "tried to push a car out of the yard" and "felt a 'pop' and then immediate severe pain in the lumbar spine region" that radiated across her back. (Tr. 603). Plaintiff reported that she could not sit, lie, bend or walk without pain, and that she felt best when lying on the couch with her legs elevated. (Id.) Upon examination, it was noted that she was acutely uncomfortable, she had decreased flexion, extension, bending, and rotation, and she was tender over the paraspinous muscles. (Tr. 605). Straight leg raise testing was positive. (Tr. 606). She had normal strength in her extremities. (Id.) She was diagnosed with low back pain. (Id.) X-rays of plaintiff's chest, performed on June 22, 2010 at Ste. Genevieve County Memorial Hospital, were negative. (Tr. 619).

In June and July of 2010, plaintiff underwent physical therapy at Mid America Rehab. (Tr. 563-72).

On July 15, 2010, plaintiff saw Ms. Lenz and reported "[n]ot much going on." (Tr. 647). She reported missing her late father and feeling upset about how a sister had treated her. (Id.) On July 22, 2010, plaintiff reported that she was smoking marijuana again, and that her relationship with her sister was improving. (Tr. 648). On July 29, 2010, Ms. Lenz noted that plaintiff complained and blamed; had no interests and no job; had a dysfunctional life in that she had money and family problems; and was unpleasant to others in that she "burp[ed] indiscriminately" and lifted "her shirt to expose her fat belly and then laughs."

(Tr. 649).

On July 29, 2010, plaintiff saw Dr. Harvey and reported life stressors, including being turned down for disability. (Tr. 573). Plaintiff reported being fairly compliant with her psychiatric medications, and reported smoking marijuana for about one week. (Id.) Dr. Harvey's diagnoses were the same, and he assessed plaintiff's GAF as 75. (Id.) He adjusted plaintiff's medication slightly. (Id.)

On August 26, 2010, plaintiff saw Ms. Lenz who noted that plaintiff gave her "usual litany" and reported the "usual" stressors and complaints. (Tr. 651). Plaintiff reported that she was still twisting and pulling her hair, but Ms. Lenz wrote that she neither witnessed that behavior nor saw evidence that it had occurred. (Id.) Ms. Lenz wrote that she explained a type of therapy to plaintiff, but plaintiff would not listen. (Id.)

In a letter dated August 9, 2010, Dr. Harvey wrote:

> Full-time employment is out of the questions [sic] for Ms. Naeger. She is not able to work, due to her mental condition. Employment is even more out of the question now, due to the current economy and job market.

(Tr. 575).

In a letter addressed to plaintiff and dated August 26, 2010, Ms. Lenz wrote:

> This letter is to confirm what we have discussed in my office on several occasions. It is not possible for you to work as an employee at this time. Your mood is too labile for you to sustain employment if you

were even able to obtain a job.
(Tr. 650).

On August 31, 2010, plaintiff saw Nurse McCullough with complaints of episodic spasms on the left side of her back, and a nodule on the right side of her neck. (Tr. 597). Plaintiff reported that she had quit physical therapy because it was not working, and that she was not doing the exercises. (Id.) Plaintiff reported that Darvocet and Soma helped, and she needed refills. (Id.) Musculoskeletal examination revealed decreased range of motion, but was otherwise normal. (Tr. 600). Psychiatric examination revealed that plaintiff was alert and oriented, and no other findings were noted. (Id.) Plaintiff was diagnosed with hyperlipidemia, abnormal weight gain, and low back pain, and told to exercise. (Tr. 600-01).

On September 2, 2010, plaintiff saw Ms. Lenz, who noted that plaintiff bought marijuana instead of continuing one of her medications. (Tr. 652). Ms. Lenz wrote that plaintiff doodled throughout the session. (Id.) On September 9, 2010, Ms. Lenz noted that plaintiff was not following a cholesterol-free diet and was not doing what her doctors told her, stating "why should I." (Tr. 653).

On October 7, 2010, plaintiff saw Ms. Lenz and was excited about her recent accomplishments in crochet work. (Tr. 654). Ms. Lenz encouraged plaintiff to continue crafts and discontinue drug use. (Id.)

On October 8, 2010, plaintiff saw Dan Frissell, M.D., of

Ste. Genevieve County Memorial Hospital Physicians' Clinics, and reported having been in a motor vehicle accident. (Tr. 589). Plaintiff complained of pain in the right side of her lower back going up to her neck and upper back, with no radiation into the buttock or legs. (Id.) She was diagnosed with back pain, cervicalgia, obesity and tobacco use disorder, and instructed to follow up if her symptoms did not improve. (Tr. 594-95).

On October 21, 2010, plaintiff returned to Ms. Lenz and was happy, and reported using coping mechanisms of shopping and dining out. (Tr. 656). Plaintiff expressed frustration that her house was cluttered and dirty and stated her intent to let a friend help her clean, but that her husband objected to this out of concern that she would throw away his belongings. (Id.) Plaintiff refused couples therapy. (Id.) On October 28, 2010, plaintiff expressed frustration that her husband would not buy craft supplies, but on November 4, 2010 reported feeling good that she and a friend had cleaned her kitchen, organized, and thrown away clutter. (Tr. 658). Plaintiff reported that she stayed energized while she had this project to focus on, and that boredom and poor social and parenting skills were sources of stress. (Id.) In the "Plan" section of the treatment note, Ms. Lenz wrote: "[n]eeds to work for better health - what kind of jobs where her hatred for people doesn't get in the way?" (Id.)

Also on November 4, 2010, plaintiff saw Dr. Harvey and reported "mostly doing ok." (Tr. 677). She reported that she was seeing Ms. Lenz for therapy and doing leather work. (Id.) She

also reported that her cat had died, but that she was fine. (Id.) Dr. Harvey diagnosed plaintiff with depression not otherwise specified, but questioned whether it was most likely substance induced. (Id.)

Plaintiff returned to Ms. Lenz on November 11, 2010, and reported doing well and talking with a friend as a coping mechanism, and complained that she was bored. (Tr. 659). She reported that she received a settlement from an accident, but it was less than they thought. (Id.) Ms. Lenz wrote that she tried to encourage family therapy. (Id.) On November 18, 2010 plaintiff complained about her adult son who lived with her and did not work or attend school, and plaintiff did not want to help him get treatment. (Tr. 660). Under "psychosocial stressors" Ms. Lenz wrote: "many of her own making." (Id.) Ms. Lenz wrote that plaintiff was "entitled and dependent" and wrote that she wanted to try to get plaintiff to accept responsibility for her status. (Id.)

On November 19, 2010, plaintiff saw Nurse McCullough with complaints of left lateral abdominal pain and knot. (Tr. 583). Plaintiff also complained of back pain when coughing and stress incontinence, but denied skin lesions and rash. (Tr. 586). Examination was normal with the exception of a tender soft mass in the left lateral abdomen, and plaintiff was diagnosed with a possible hernia. (Tr. 586-87). An ultrasound of the abdomen, performed on November 22, 2010 at Ste. Genevieve County Memorial Hospital, was unremarkable. (Tr. 617).

On December 2, 2010, plaintiff reported that she hated everyone, especially her mother, sister and son, and was stressed about the lack of money, boredom, and disappointment in life. (Tr. 661). Ms. Lenz wrote: "I cannot support this client's bid for disability when she is choosing to stay dependent and entitled." (Id.)

CT of plaintiff's abdomen and pelvis, performed on December 7, 2010 at Ste. Genevieve County Memorial Hospital, revealed fatty infiltration of the liver, but no acute findings. (Tr. 613).

On December 9, 2010, plaintiff saw Ms. Lenz and reported that family members had accused her of stealing her father's leather work. (Tr. 662). Ms. Lenz wrote that plaintiff felt entitled to it, and was pouting and defensive. (Id.) Plaintiff was stressed about money, boredom, and her status. (Id.) Ms. Lenz wrote that, instead of resolving issues, plaintiff only tried power struggles or "cut-offs." (Id.) Ms. Lenz wrote that plaintiff essentially said "f— off" and "I'm through with those people," and showed no interest in conflict resolution skills. (Tr. 662).

On December 13, 2010, plaintiff saw Nurse McCullough. (Tr. 577). In the section of Nurse McCullough's treatment note reserved to record plaintiff's complaints and the reason she came to the office for care, Nurse McCullough wrote that plaintiff was there to get papers for disability. (Id.) It is noted that plaintiff had hired a disability specialist group to try to obtain disability for mental issues. (Id.) In the section marked "Coded

Allergies," Nurse McCullough wrote, <u>inter</u> <u>alia</u>, "Cortisone (Unknown, Psorias [sic] worse 11/19/10). Plaintiff denied abnormal pigmentation, lesions, acute rash, and chronic rash. (Tr. 580). Nurse McCullough noted that examination, including examination of plaintiff's musculoskeletal system, skin, and psychiatric condition, yielded normal results. (Tr. 580-81).

On December 14, 2010, Nurse McCullough completed a medical source statement in which she diagnosed plaintiff with gastroesophageal reflux disease, fatty liver, spondylosis of the thoracic spine, osteoarthritis and depression. (Tr. 620). Nurse McCullough opined that plaintiff's "[p]rognosis for ability to return to work" was "fair to poor." (<u>Id.</u>) When asked to opine whether the cumulative effect of plaintiff's medical problems would allow her to work any number of hours per day from zero to eight, Nurse McCullough wrote "I really can't determine this, I believe the major impediment to work is the Psychiatric [dignosis]." (<u>Id.</u>) Nurse McCullough opined that plaintiff would miss work three times per month, and that pain or other symptoms were so severe as to disrupt plaintiff's concentration and attention, and that plaintiff had a marked limitation in her ability to deal with work stress. (<u>Id.</u>) Nurse McCullough opined that plaintiff could frequently lift up to ten pounds and occasionally lift 20, and could sit, stand and/or walk less than two hours in an eight-hour work day. (Tr. 620).

On December 16, 2010, Ms. Lenz wrote that plaintiff was:

Thinking of "firing" Dr. Harvey because

> [plaintiff's disability lawyers] said his GAF
> score does not match his stating she cannot
> work at present i.e. GAF score is too high
> (70s) to support a claim of disability.

(Tr. 663).

Plaintiff was overwhelmed and angry. (Id.) Ms. Lenz wrote that plaintiff was "desperate for disability to solve financial status, relationship [with] husband and pay off back mortgage." (Id.)

On December 20, 2010, Ms. Lenz opined that plaintiff would likely miss work more than three times per month, that she would constantly experience symptoms severe enough to interfere with her ability to get along with others and constantly be limited in her ability to handle work demands, persistence and expectations, that she was severely limited in her ability to deal with work stress, and frequently limited in her ability to focus, organize, and timely complete work tasks. (Tr. 621).

On December 23, 2010, Ms. Lenz noted that plaintiff felt she was being forced to deal with her poor parenting skills. (Tr. 664). Ms. Lenz also noted that plaintiff wanted "only to chit chat, not deal [with] issues" especially those related to her older son. (Id.) It was noted that plaintiff was buying unnecessary things while claiming she could not afford treatment for her son. (Id.)

On December 30, 2010, plaintiff saw Dr. Harvey and reported doing better recently. (Tr. 676). She was pleasant and cooperative. (Id.)

On January 28, 2011, Ms. Lenz noted that plaintiff was

displaying less anger, and felt good about having cleaned her kitchen with a friend's help. (Tr. 666). Plaintiff reported conflict during a recent family event. (Id.) Ms. Lenz wrote that plaintiff wanted only "to 'visit,' get support for whatever she does then threatens to fire me and tells me how to do my job if I persist." (Id.) On March 3, 2011, plaintiff reported feeling angry at her husband because he would not let her drive. (Tr. 668). Ms. Lenz wrote that plaintiff stated "only comes in to be supported - doesn't want to learn." (Id.) Ms. Lenz wrote that she would try to engage plaintiff in treatment. (Id.) Plaintiff's following visit, on March 10, 2011, was similar. (Tr. 669).

On February 24, 2011, plaintiff saw Dr. Harvey and reported that she could not sleep at night and slept during the day. (Tr. 675). She was pleasant and cooperative. (Id.)

In a letter dated March 17, 2011, Dr. Harvey wrote:

Employment is out of the questions [sic] for Ms. Naeger. She is not able to work due to her mental condition. Please honor her request for assistance, including food stamps.

(Tr. 623).

On March 24, 2011, Ms. Lenz wrote:

Both [plaintiff] & her husband made a big to do about paying me the balance of the deductible they owe me. Both demanded they get their records now. I explained again they are not paying for the records.

No money/about to lose house though have only paid 10 of 24 mortgage payments.

. . . her husband is blaming her for not working.

> Unrealistic hope that being approved for
> disability earlier due to foreclosure & that
> disability will solve their financial issues.

(Tr. 670).

Ms. Lenz's records include an April 7, 2011 notation that plaintiff was going to fire Ms. Lenz "due to some paranoid notion of me keeping my medical records from [plaintiff's disability lawyers]." (Tr. 671). It is noted that plaintiff feared that her husband would leave her if she did not work or get disability. (Id.) It is noted that plaintiff was "never interested in learning new ways to cope or manage her emotions. She only wanted to 'visit,' be supported & get disability." (Id.) It is noted that Ms. Lenz's office advised Dr. Harvey that plaintiff had discontinued seeing her and that Ms. Lenz would not attempt to bring her back to therapy because plaintiff was "non-compliant and has a nasty accusatory disposition." (Id.) The record includes an update that Dr. Harvey "responded he 'totally understands.'" (Tr. 671).

On April 21, 2011, plaintiff saw Dr. Harvey and was not doing well, but could not articulate why. (Tr. 674). She reported that she was unhappy with Ms. Lenz, and Dr. Harvey wrote that plaintiff was "really lashing out" at Ms. Lenz. (Id.)

On April 27, 2011, plaintiff was seen by Stephanie Gegg, a licensed clinical social worker, at the Community Counseling Center. (Tr. 681). The chief complaint on Ms. Gegg's intake note is that plaintiff reported having fired her former therapist for not sending medical records, explaining that she wanted to have

medical records sent to her disability lawyers, but the former therapist made excuses and did not do it. (Id.) Plaintiff also stated that her family and son were off limits, and she wanted her therapy to be about her and her history of sexual abuse. (Tr. 681-84). Regarding her medical history, plaintiff reported being in fair health, although she did have high cholesterol but could not afford the medication. (Id.) She reported taking medication for back pain, and also reported that she was not smoking marijuana but did smoke cigarettes. (Tr. 681-82). Plaintiff denied ever attempting suicide or engaging in self-mutilation, but did say that she twisted and pulled out her hair. (Tr. 682). Ms. Gegg assessed a 60 GAF. (Tr. 684). During her treatment with Ms. Gegg, plaintiff was alternately tearful and angry, but otherwise, clinical mental status signs were normal. (Tr. 678-84). Plaintiff was noted to dress appropriately, use good hygiene and grooming, be talkative with normal speech quality, and demonstrate normal motor behavior. (Id.) Plaintiff was observed to be alert, responsive, cooperative, with good eye contact, logical and coherent thought processes, and appropriate affect. (Id.)

On April 30, 2011, Ms. Lenz completed a Discharge Summary. (Tr. 624-26). Ms. Lenz wrote that she and plaintiff mutually agreed to terminate services, and wrote that she believed that plaintiff was not making much progress and was not interested in learning and trying new behaviors. (Tr. 624). Ms. Lenz wrote that plaintiff wanted to "fire" her because she was angry that Ms. Lenz did not send her records quickly enough to the law firm

handling her disability claim. (_Id._) Ms. Lenz wrote that plaintiff still maintained that she hated people and therefore could not work. (_Id._) Ms. Lenz wrote that plaintiff blamed others for her problems, and "saw disability as the answer to her financial problems and a way to keep her husband because she would then be contributing to household income." (_Id._)

Ms. Lenz wrote that she had ruled out borderline personality disorder because plaintiff's interpersonal relationships were stable. (Tr. 625). She wrote that plaintiff exhibited traits of various personality disorders, but did not fully meet the criteria for any one in particular. (_Id._) She wrote that plaintiff was "able to turn on & off her anger and tears when reacting to events or statements so her reactions do not appear genuine." (_Id._)

Ms. Lenz wrote that, while plaintiff once went for three months without using marijuana, she always resumed using it because she felt she deserved to. (_Id._) This was identified as a source of conflict with plaintiff's husband, who resented her spending money to buy marijuana, a feeling plaintiff stated she understood because she had a history of spending money irresponsibly. (Tr. 625).

Ms. Lenz wrote that plaintiff made few sincere attempts to try to learn new behaviors, and instead "appeared to be biding her time until her Disability Determination would be made." (_Id._) Ms. Lenz wrote that plaintiff "would periodically question whether making improvements would harm her claim/case." (_Id._) Ms. Lenz

wrote that plaintiff "scoffed" at therapeutic treatments and, when she tried to introduce a new technique to plaintiff, plaintiff would throw a "temper tantrum" and say that Ms. Lenz's job was only to support her. (Id.) She wrote that plaintiff wanted special treatment and felt entitled to it, and that plaintiff repeatedly refused to try any form of therapy and wanted only to visit, make small talk, and be soothed. (Tr. 626).

> Ms. Lenz wrote:

> When I began to ask why she wasn't trying [plaintiff] would become angry and accusing "why should I bother?" She saw me finally as a threat to her plan. Her plan was to not work, continue "hating people" and try to appease her husband so someone would take care of her. I was no longer able to keep her engaged in treatment.

> (Id.)

On May 12, 2011, Dr. Harvey noted that plaintiff was sleeping better on a new medication, and had a lot of anxiety about her forthcoming hearing in August. (Tr. 673). On June 10, 2011, Dr. Harvey noted that plaintiff was doing better but disliked the new sleep medication because it made her too sleepy. (Tr. 672).

On August 18, 2011, plaintiff presented to St. John's Mercy Medical Center with the chief complaint: "I tried to hurt myself," and was admitted. (Tr. 686). It is noted that plaintiff took three pills in a suicide gesture. (Id.) She reported difficulties with ongoing marijuana consumption, and reported that she smoked two packs of cigarettes per day. (Id.) Upon examination, it was noted that plaintiff denied present suicidal or

homicidal thoughts, but acknowledged prominent stress bringing her to the hospital. (Tr. 687). Insight and judgment were fair, and she was well-oriented with good recall and calculations. (Id.) It is noted that initial consideration was given to the possibility that plaintiff should attend an outpatient treatment program following discharge. (Id.) During hospitalization, plaintiff improved with medication adjustments, but had complaints of chest pain and was evaluated in the emergency room. (Tr. 688). Cardiac testing was normal, and plaintiff's chest pain resolved. (Tr. 695). Plaintiff was discharged to home. (Id.)

On August 31, 2011, Dr. Harvey wrote that he had seen plaintiff since December of 2009, and that, during that time, her GAF score was recorded in the 50-75 range, with her more recent GAF score at 60. (Tr. 685). Dr. Harvey wrote:

> As you know, the GAF score does not correlate well with actual psychiatric disability or inability to work. Also, the fact that her clinical status fluctuates is another reason that gainful employment is unlikely for [plaintiff].
>
> For now, full-time work is something that she is both unable to do, and is advised to not do.

(Id.)

### III. The ALJ's Decision

The ALJ determined that plaintiff had the severe impairments of degenerative disc disease, obesity, asthma, depression not otherwise specified, marijuana dependence, and cognitive problems not otherwise specified. (Tr. 13). The ALJ

determined that plaintiff did not have an impairment or combination of impairments of listing-level severity. (Tr. 14). The ALJ conducted an exhaustive analysis of the medical evidence of record and concluded that plaintiff retained the residual functional capacity ("RFC") to perform medium work as defined in 20 C.F.R. § 404.1567(c), except that she should have no concentrated exposure to pulmonary irritants, and she was able to perform simple, routine tasks that can be performed independently and that involve working primarily with things rather than people, and beyond that any social interaction must be only superficial interaction with co-workers and supervisors and no direct interaction with the general public. (Tr. 16).

The ALJ determined that plaintiff was capable of performing her past relevant work as a binder. (Tr. 25). The ALJ alternately found, considering the Medical-Vocational Guidelines along with VE testimony, that jobs existed in the national economy that plaintiff could perform. (Tr. 26). The ALJ concluded that plaintiff was not under a disability, as defined in the Act, at any time through the date of the decision. (Tr. 27).

## IV.    Discussion

To be eligible for Disability Insurance Benefits and Supplemental Security Income under the Social Security Act, plaintiff must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992). The Act defines disability as the "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. <u>See</u> 20 C.F.R. § 404.1520; <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether the claimant's impairment(s) meet or equal any listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to a listed impairment, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Estes v. Barnhart</u>, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find adequate to support the conclusion. <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1147 (8th Cir. 2001). The "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." <u>Coleman v. Astrue</u>, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). The Court must also consider any evidence which fairly detracts from the Commissioner's decision. <u>Coleman</u>, 498 F.3d at 770; <u>Warburton v. Apfel</u>, 188 F.3d 1047, 1050 (8th Cir. 1999).

If substantial evidence exists to support the administrative decision, this Court must affirm that decision even if the record also supports an opposite decision. <u>Weikert v. Sullivan</u>, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); <u>see also</u> <u>Jones ex rel. Morris v. Barnhart</u>, 315 F.3d 974, 977 (8th Cir. 2003); <u>see</u> <u>also</u> <u>Pearsall</u>, 274 F.3d at 1217 (citing <u>Young v. Apfel</u>, 221 F.3d 1065, 1068 (8th Cir. 2000) (In the event that two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole).

A.    <u>Step 2 Findings Regarding Pustular Psoriasis</u>

At Step 2 of the sequential evaluation process, the ALJ

determined that plaintiff had the severe impairments of degenerative disc disease, obesity, asthma, depression not otherwise specified, marijuana dependence, and cognitive problems not otherwise specified. The ALJ did not find pustular psoriasis to be a severe impairment, noting that plaintiff was treated for a skin condition only once during the relevant time period. Arguing that the ALJ's finding was error, plaintiff cites to page 577 of the administrative record and argues that this office note "shows treatment for the problem. It shows the psoriasis worse on 11/15/2010." (Docket No. 13 at 4). Review of the record reveals no error at Step 2 of the sequential evaluation process.

At Step 2, the ALJ decides whether the claimant has a "severe impairment," meaning one which significantly limits her ability to do basic work activities. SSR 96-3p, 1996 WL 362204, *34469 (July 2, 1996). In Bowen v. Yuckert, after upholding the validity of Step 2's threshold severity requirement, the Supreme Court adopted a standard for its application which provides that "[o]nly those claimants with slight abnormalities that do not significantly limit any 'basic work activity' can be denied benefits without undertaking" the subsequent steps of the sequential evaluation process. 482 U.S. at 158.

At Step 2, the claimant bears the burden of establishing the presence of a severe impairment or combination of impairments. See Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007). While severity is not an onerous requirement for the claimant to meet, it "is also not a toothless standard, and [the Eighth Circuit has]

upheld on numerous occasions the Commissioner's finding that a claimant failed to make this showing." Id. (internal citation omitted).

As the ALJ observed, on October 2, 2009, Nurse McCullough treated plaintiff for a rash on her chest and abdomen that was diagnosed as a self-limiting skin condition that would resolve on its own in six to 12 weeks without treatment. (Tr. 480-83). Review of page 577 of the administrative transcript shows no diagnosis of or treatment for psoriasis. See (Tr. 577). Page 577 is the first page of Nurse McCullough's December 13, 2010 office note. (Id.) On that date, plaintiff saw Nurse McCullough "for papers for diability [sic]." (Tr. 577). In the section of Nurse McCullough's office note entitled "Coded Allergies," she wrote "Cortisone (Unknown, PSORIAS [sic] WORSE 11/19/10). (Id.) This is not an observation that plaintiff had worsening psoriasis when she was seen. It is a notation that cortisone caused an allergic reaction. In fact, during this visit, plaintiff denied abnormal pigmentation, lesions, acute rash, and chronic rash, Nurse McCullough recorded normal findings upon examination of plaintiff's skin, and Nurse McCullough's "current visit problems" list includes no reference to pustular psoriasis. (Tr. 580-81). The page plaintiff references in support of her argument concerning the ALJ's Step 2 findings is not helpful to plaintiff, and she makes no other attempt to challenge the ALJ's failure to find that pustular psoriasis was a severe impairment. Therefore, on the claim that plaintiff raises, the undersigned concludes that the ALJ properly

evaluated the severity of pustular psoriasis.[6]

B.    Opinion Evidence

In his written decision, the ALJ comprehensively discussed the medical evidence of record.  The ALJ wrote that Dr. Morgan's indication of moderate limitation in the areas of concentration, persistence and pace was inconsistent with various admissions plaintiff made.  (Tr. 16).  The ALJ also wrote that he gave the greatest weight to the treatment notes of Dr. Harvey, and little weight to the opinion evidence from Dr. Harvey, Ms. Lenz, and Nurse McCullough.  (Tr. 19-25).  In his decision, the ALJ gave several valid reasons for the weight given to each opinion.  (Tr. 16, 19-25).

Citing to page 16 of the administrative transcript, plaintiff complains that the ALJ improperly "discounted the medical opinions" as inconsistent with plaintiff's admissions that she performed certain daily activities listed by the ALJ.  (Docket No.

_____

[6]Plaintiff also states that she testified that she could not expose her hands to water or chemicals, and the ALJ's hypothetical question to the VE was defective because it did not include these limitations due to pustular psoriasis.  (Docket No. 13 at 4-5).  However, in an alternate hypothetical question, the ALJ asked the VE to add the limitations of a need to wear non-latex gloves and avoid bare-handed exposure to water or chemicals.  (Tr. 70).  The vocational expert testified that such an individual could still perform the jobs of poultry eviscerator and store laborer as described earlier.  (Tr. 70-71).  The vocational expert also testified that the individual could still perform the job of housekeeper/cleaner, although the number of those jobs would be reduced.  (Id.)  Even if the ALJ should have determined that pustular psoriasis was a severe impairment, the hypothetical questions posed to the VE would be determined to have sufficiently accounted for plaintiff's limitations, and the ALJ's ultimate decision would have been the same.

13 at 5). Plaintiff does not identify the particular medical opinion she is referencing but, given plaintiff's page citation and her statements in support of her argument, it appears plaintiff references the ALJ's discussion of Dr. Morgan's indication that plaintiff had moderate limitations in all three areas of concentration, persistence and pace.

On the page plaintiff cites, the ALJ wrote that Dr. Morgan's indication of moderate limitation in all three of those areas was inconsistent with plaintiff's admissions that she watched television, took her dogs outside, played computer games, prepared her own meals, drove, shopped, worked puzzles, and paid bills. Despite plaintiff's suggestion to the contrary, the ALJ's reasons for discounting that part of Dr. Morgan's opinion are supported by the record. When describing her daily activities in her Function Report, plaintiff wrote that she made coffee, watched television, took her two dogs "out to potty," watched television, made something to eat, played on the computer, and did word and number puzzles, including Sudoku. (Tr. 294, 298). She reported that she brushed her pets, took one dog out on a leash, and put the other one out on a line. (Tr. 295). She reported that she was able to pay bills, count change, and use a checkbook or money order. (Tr. 297). She did report that she was unable to handle a savings account, but explained that this was because she did not have extra money for savings. (Id.) She reported that she had a valid driver's license, and was able to drive. (Tr. 303).

The ALJ noted that, if plaintiff did not shop, it was

because her husband discouraged her from shopping due to her irresponsible spending, not due to any social or concentration limitations. (Tr. 46). In addition, the undersigned notes that Ms. Lenz wrote, in October of 2010, that plaintiff reported using shopping and dining out as coping mechanisms. (Tr. 656). Plaintiff also reported to Ms. Lenz in May and October of 2010 that she engaged in various arts and crafts, and was excited about her recent accomplishments in crochet and leather work. (Tr. 632, 654). The record supports the ALJ's conclusion that Dr. Morgan's indication of a moderate limitation in concentration, persistence and pace was inconsistent with plaintiff's ability to function.

Plaintiff's final arguments concern the ALJ's decision to give little weight to the opinion evidence from Dr. Harvey, Ms. Lenz, and Nurse McCullough. In response to plaintiff's arguments the Commissioner argues, inter alia, that all of these opinions, particularly as they relate to plaintiff's mental health, were based in large part on plaintiff's subjective complaints, which the ALJ had properly rejected after undertaking a legally sufficient analysis. This argument is well-taken. In bringing her claims in this Court, plaintiff does not develop an argument specifically challenging the ALJ's credibility assessment. Even so, the undersigned has fully analyzed the ALJ's credibility determination, and concludes that it is supported by substantial evidence on the record as a whole. In his decision, the ALJ wrote that he had considered all symptoms and the extent to which they could reasonably be accepted as consistent with the objective medical

evidence and other evidence, based on the requirements of 20 C.F.R. § 404.1529, and SSRs 96-4p and 96-7p. The ALJ then noted several inconsistencies in the record that detracted from the credibility of plaintiff's subjective complaints, all of which the undersigned has considered and has determined are supported by substantial evidence on the record as a whole. The undersigned will specifically discuss those elements of the ALJ's credibility determination that are relevant to plaintiff's claims herein.

### 1. Dr. Harvey

Plaintiff contends that the ALJ erroneously discounted Dr. Harvey's opinion as being conclusory and based upon the state of the economy instead of plaintiff's abilities and limitations. Plaintiff also argues that the ALJ erroneously concluded that Dr. Harvey's opinion evidence was inconsistent with his treatment notes. Review of the record reveals no error.

Plaintiff correctly characterizes Dr. Harvey as her treating psychiatrist. A treating physician's opinion is generally entitled to substantial weight, but it does not automatically control, because the ALJ must evaluate the record as a whole. Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir. 2007) (citing Charles v. Barnhart, 375 F.3d 777, 783 (8th Cir. 2004)). According to the Regulations and to Eighth Circuit precedent, a treating physician's opinion must be well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(3); Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir.

2005). "If the opinion fails to meet these criteria, however, the ALJ need not accept it." Davidson v. Astrue, 578 F.3d 838, 842 (8th Cir. 2009) (citing Hacker, 459 F.3d at 937); see also Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997); Ward v. Heckler, 786 F.2d 844, 846 (8th Cir. 1986) (If justified by substantial evidence in the record as a whole, the ALJ can discount a treating physician's opinion). When an ALJ discounts a treating physician's opinion, he should give "good reasons" for doing so. Davidson, 501 F.3d at 990 (citing Dolph v. Barnhart, 308 F.3d 876, 878 (8th Cir. 2002)).

The ALJ in this case gave several good reasons for discounting Dr. Harvey's opinion evidence. The ALJ noted that Dr. Harvey qualified one of his opinions with a statement concerning the economy. While Dr. Harvey did not include this qualification in all of his opinion letters, the fact that he rested at least part of his opinion evidence on the economy rather than plaintiff's condition detracts from his opinions as a whole. The ALJ also noted that none of Dr. Harvey's opinion evidence included a narrative or an explanation of plaintiff's symptoms, clinical signs, and specific functional limitations to support Dr. Harvey's conclusions. A treating physician's opinion is accorded controlling weight only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2). It therefore appears that Dr. Harvey's opinion evidence was based largely on plaintiff's subjective

allegations, which the ALJ properly discredited after undertaking a legally sufficient analysis. An ALJ may discount an opinion that is based largely on a claimant's subjective complaints rather than objective medical evidence. Kirby, 500 F.3d at 709.

The ALJ noted that Dr. Harvey's opinions were too conclusory to be entitled to great weight. A physician's conclusory statement of disability, without supporting evidence, does not overcome substantial medical evidence supporting the Commissioner's decision. Loving v. Department of Health and Human Services, 16 F.3d 967, 971 (8th Cir. 1994); Browning v. Sullivan, 958 F.2d 817, 823 (8th Cir. 1992). The ALJ noted that Dr. Harvey's opinions that plaintiff could not work exceeded his expertise as a psychiatrist and intruded onto the province of a vocational expert. A medical source's opinion that a claimant is "disabled" or "unable to work" involves an issue reserved for the Commissioner, and is therefore not the type of medical opinion to which the Commissioner gives controlling weight. See Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("[T]reating physicians' opinions are not medical opinions that should be credited when they simply state that a claimant can not be gainfully employed, because they are merely opinions on the application of the statute, a task assigned solely to the discretion of the Commissioner"); 20 C.F.R. § 404.1527(e)(1).

The ALJ noted that Dr. Harvey's opinion evidence was inconsistent with his own treatment notes, which indicated mostly normal signs (except for some poor insight and judgment and some

exaggerated responsivity), high GAF scores, and indications that plaintiff's symptoms were largely due to marijuana use. Contrary to plaintiff's assertion, an ALJ is entitled to discount a treating physician's opinion that is inconsistent with his or her treatment notes. <u>Davidson</u>, 578 F.3d at 842 ("It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes").

In the context of her arguments concerning the ALJ's treatment of Dr. Harvey's opinion evidence, plaintiff states that the ALJ did not consider plaintiff's last hospitalization. Plaintiff does not, however, develop an argument concerning how the last hospitalization should have changed the ALJ's treatment of Dr. Harvey's opinion evidence. As noted in the above summary of the medical information, plaintiff was hospitalized on August 18, 2011 after presenting to St. John's Mercy Medical Center and reporting having swallowed three pills in a suicidal gesture. This evidence was considered by the Appeals Council. "Where, as here, the Appeals Council considers new evidence but denies review, [the reviewing court] must determine whether the ALJ's decision was supported by substantial evidence on the record as a whole, including the new evidence." <u>Davidson</u>, 501 F.3d at 990. This latest hospitalization in no way undermines the ALJ's decision regarding Dr. Harvey's opinion evidence, or the ALJ's ultimate decision. After presenting to the hospital, plaintiff reported no suicidal ideation. During her stay, she improved with medication and, while it was initially thought that she may need to transition

from the hospital into intensive outpatient treatment, it was ultimately concluded that she did not need this and could simply be discharged to home. This hospitalization fails to detract from the ALJ's decision to discount Dr. Harvey's opinion evidence, and it in no way undermines the ALJ's decision.

After fully considering Dr. Harvey's opinion evidence in light of his own treatment records and the evidence in the record as a whole, the ALJ concluded that he resolved all of the inconsistencies by giving greater weight to Dr. Harvey's actual treatment notes. As explained above, this finding is supported by substantial evidence on the record as a whole.

2. <u>Ms. Lenz</u>

The ALJ also wrote that he was giving little weight to the opinion evidence from Ms. Lenz. As noted in the above summary of the medical information, in August 2010, Ms. Lenz wrote that it was not possible for plaintiff to work as an employee, and in December 2010 completed a medical source statement indicating that plaintiff would miss work often and suffer constant interference from symptoms. Without specifying which statement, plaintiff complains that the ALJ "discounted the disability evaluation of Maureen Lenz because of her discharge summary"[7] when in fact the discharge summary "clearly shows a patient with serious mental health issues" in that plaintiff was not progressing as Ms. Lenz

---

[7]As noted above, Ms. Lenz treated plaintiff from May 2010 through April 2011. Ms. Lenz's discharge summary is dated April 30, 2011. It was completed following the conclusion of her treatment relationship with plaintiff.

would have liked. (Docket No. 13 at 5). Plaintiff also contends that "nowhere in the discharge summary does Ms. Lenz contradict her prior opinions or say that the claimant is not disabled." (Id.) Review of the ALJ's decision reveals that he properly considered the evidence from Ms. Lenz.

Ms. Lenz was a licensed clinical social worker. The Commissioner's Regulations provide that evidence to establish an impairment must come from "acceptable medical sources," which are defined as licensed medical or osteopathic physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 404.1513(a)(1)-(5). Licensed clinical social workers, like Ms. Lenz, are defined elsewhere in the Regulations as "other sources" whose opinions may be used to help understand how a claimant's impairments affect her ability to work. 20 C.F.R. § 404.1513(d).

Plaintiff contends that the discharge summary shows that plaintiff was not progressing as Ms. Lenz would have liked, an indication that plaintiff was seriously mentally ill. This argument is not well-taken. Ms. Lenz did not attribute plaintiff's failure to progress to any mental illness. She attributed it to plaintiff's own choice to refuse to cooperate with therapy. Throughout her treatment relationship with plaintiff, Ms. Lenz repeatedly documented plaintiff's unwillingness to work on issues and her refusal to try forms of therapy that Ms. Lenz thought would help plaintiff. Ms. Lenz wrote that plaintiff preferred instead to chit chat, be soothed, visit, and receive support for whatever she

did.  Ms. Lenz never suggested that plaintiff's failure to progress in therapy was due to any serious mental illness, nor did she ever indicate that plaintiff required hospitalization, intensive outpatient treatment, or therapy that was more serious than what Ms. Lenz could offer.

Plaintiff also complains that Ms. Lenz did not contradict her prior opinions or say that plaintiff is not disabled.  However, the fact that Ms. Lenz did not expressly recant her prior opinions or the fact that she did not say that plaintiff was not disabled provides no basis to remand the ALJ's decision.  In addition, as the ALJ observed, Ms. Lenz's post-opinion evidence document her observations that plaintiff refused to engage in therapy and focused instead on qualifying for disability benefits.  Ms. Lenz indicated that plaintiff was a malingerer, in that plaintiff was "able to turn on & off her anger and tears when reacting to events or statements so her reactions do not appear genuine." (Tr. 625). Ms. Lenz did not attribute any of the foregoing to mental illness; instead, she attributed it to plaintiff's own choices. The ALJ also noted Ms. Lenz's observations that plaintiff "appeared to be biding her time until her Disability Determination would be made," would "periodically question whether making improvements would harm her claim/case," and ultimately saw Ms. Lenz as "a threat to her plan" which was "to not work, continue 'hating people.'" (Tr. 625-26). The ALJ concluded that Ms. Lenz's records revealed that plaintiff was not serious about treatment and did not want to try certain treatment modalities, an indication that her alleged mental

symptoms were not as severe or functionally limiting as she alleged. O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003) (An ALJ may discount a claimant's allegations if there is evidence that he is a malingerer or was exaggerating symptoms for financial gain).

Also notable is the fact that Ms. Lenz's August and December 2010 opinion evidence includes no documentary narrative to support her conclusions. Even a treating physician's opinion is accorded controlling weight only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2). It therefore appears, as the Commissioner argues, that Ms. Lenz's opinions were based largely upon plaintiff's subjective allegations, which the ALJ properly discredited after undertaking a legally sufficient analysis. An ALJ may discount an opinion that is based largely on a claimant's subjective complaints rather than objective medical evidence. Kirby, 500 F.3d at 709.

### 3. Nurse McCullough

The ALJ wrote that he was giving little weight to the opinion evidence from Nurse McCullough. Plaintiff alleges error, arguing that the ALJ ignored her long treatment relationship with Nurse McCullough, and made several inaccurate observations. Review of the record reveals no error.

As the ALJ correctly observed, Nurse McCullough is not an "acceptable medical source" whose evidence can be used to establish

an impairment. 20 C.F.R. § 404.1513(a)(1)-(5). Nurse Practitioners, like Nurse McCullough, are "other sources" whose opinions may help understand how a claimant's impairments affect her ability to work. 20 C.F.R. § 404.1513(d)(1).

The ALJ noted that, while Nurse McCullough opined that plaintiff was limited primarily by her psychiatric impairments, Nurse McCullough was not a mental health specialist. The ALJ was entitled to consider that Nurse McCullough's opinion limiting plaintiff based upon psychiatric impairments was beyond the scope of her expertise and therefore not entitled to significant weight. "Greater weight is generally given to the opinion of a specialist about medical issues in the area of specialty, than to the opinion of a non-specialist." Brown v. Astrue, 611 F.3d 941, 954 (8th Cir. 2010) (internal citation omitted).

The ALJ also observed that, although Nurse McCullough described limitations that would essentially leave plaintiff bed-bound most of the day, the objective medical evidence of record, which the ALJ exhaustively summarized, provided no basis for such drastic physical limitations. While plaintiff contends that radiological studies confirm that gardening causes back pain, a May 28, 2010 lumbar spine MRI showed no acute spine disease, and thoracic spine MRI showed no preexisting spondylosis with minimal cord impingement and no displacement. Even a treating physician's opinion must be consistent with the balance of the evidence of record in order to be entitled to controlling weight. See Reed, 399 F.3d at 920. Also notable is that, despite Nurse McCullough's

assessment of extreme physical limitations, she advised plaintiff to exercise. (Tr. 600-01).

As plaintiff contends, Nurse McCullough did treat plaintiff for back pain after plaintiff pushed a car in June of 2010. As plaintiff also contends, she did have positive straight leg raise testing on June 22, 2010 and diminished knee reflexes on October 8, 2010. However, as the ALJ observed, by November of 2010 plaintiff had no knee complaints, and complained of back pain only when coughing. When she saw Nurse McCullough in December of 2010, it was for the purpose of getting disability papers, not treatment, and Nurse McCullough's musculoskeletal examination was negative. Even a treating physician's opinion must be consistent with his or her own treatment records in order to be entitled to significant weight. See Davidson, 578 F.3d at 842 ("It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes"). Also notable is the fact that Nurse McCullough's opinion evidence includes no documentary narrative to support her conclusions. Even a treating physician's opinion is accorded controlling weight only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2). It therefore appears, as the Commissioner argues, that Nurse McCullough's opinions were based largely upon plaintiff's subjective allegations, which the ALJ properly discredited after undertaking a legally sufficient analysis. An

ALJ may discount an opinion that is based largely on a claimant's subjective complaints rather than objective medical evidence. <u>Kirby</u>, 500 F.3d at 709. The ALJ was not bound by "other source" Nurse McCullough's inconsistent and unsupported opinion that contradicted her own notes and exceeded the scope of her expertise.

For all of the foregoing reasons, on the claims that plaintiff raises, the undersigned determines that the Commissioner's decision is supported by substantial evidence on the record as a whole, and should therefore be affirmed. Because there is substantial evidence to support the decision, reversal is not required merely because substantial evidence may support a different outcome, or because another court could have decided the case differently. <u>Gowell v. Apfel</u>, 242 F.3d 793, 796 (8th Cir.2001); <u>Browning</u>, 958 F.2d at 821.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed, and plaintiff's Complaint is dismissed with prejudice.


_Frederick R. Buckles_
Frederick R. Buckles
UNITED STATES MAGISTRATE JUDGE


Dated this 26th day of September, 2013.